******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ANTHONY DYOUS
(AC 42006)

DiPentima, C. J., and Keller and Bear, Js.

*Syllabus*

The defendant acquittee, who had been found not guilty of certain crimes
by reason of mental disease or defect, appealed to this court from the
judgment of the trial court granting the state's petition filed pursuant
to statute (§ 17a-593) to extend his commitment to the jurisdiction of
the Psychiatric Security Review Board, claiming that the court improp-
erly found that, at the time of the state's petition, he was mentally ill
and dangerous to himself or others. Following a hearing on the state's
petition, the board determined that the acquittee remained an individual
with psychiatric disabilities and, if he were discharged from the jurisdic-
tion of the board, he would present a danger to himself or others.
Thereafter, the court held a hearing and granted the state's petition and
extended the acquittee's commitment to the board for an additional
four years. From the judgment rendered thereon, the acquittee appealed
to this court. *Held* that the trial court's findings that the acquittee, at
the time of the petition to extend his commitment, suffered from a
mental illness and that he would present a danger to himself or others
as a result of his mental illness if released from the jurisdiction of the
board, were not clearly erroneous: the court found both the board's
report, which summarized the acquittee's mental health history and set
forth his multiple diagnoses, and the testimony of G, the acquittee's
treating psychiatrist, to be credible, at the outset of the board's report,
the participating board members attested to their presence at the hear-
ing, that they had reviewed the record, and that the report issued to
the court was based entirely on the record, the law and the board's
specialized knowledge and familiarity with the acquittee, and the totality
of the evidence supported the court's finding that the acquittee presented
a danger to himself or others if released from the jurisdiction of the
board, including a review of the acquittee's lengthy struggle with mental
illness, his failure to cooperate with treatment and medication recom-
mendations and his past violent behaviors and mental health decompens-
ations when outside of a maximum security setting.

Argued January 7—officially released June 23, 2020

*Procedural History*

Petition for an order extending the defendant's com-
mitment to the Psychiatric Security Review Board,
brought to the Superior Court in the judicial district of
Windham and tried to the court, *J. Fischer, J.*; judgment
granting the petition, from which the defendant
appealed to this court. *Affirmed.*

*Richard E. Condon*, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney,
with whom, on the brief, were *Anne F. Mahoney*, state's
attorney, and *Andrew J. Slitt*, assistant state's attorney,
for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Anthony Dyous (acquittee),[1] appeals from the judgment of the trial court granting the state's petition to extend his commitment to the jurisdiction of the Psychiatric Security Review Board (board) for a period of four years. On appeal, the acquittee claims that the court improperly found that, at the time of the state's petition, he was mentally ill and dangerous to himself or others. We disagree and, accordingly, affirm the judgment of the trial court.

The acquittee's psychiatric history and proceedings with the criminal court and the board have been detailed extensively in *State* v. *Dyous*, 307 Conn. 299, 53 A.3d 153 (2012) (*Dyous I*), and *State* v. *Dyous*, 153 Conn. App. 266, 100 A.3d 1004 (2014) (*Dyous II*), appeal dismissed, 320 Conn. 176, 128 A.3d 505 (2016) (certification improvidently granted). These opinions set forth the following relevant facts and procedural history. On March 22, 1985, the acquittee was found not guilty by reason of mental disease or defect of two counts of kidnapping in the first degree, two counts of threatening in the second degree, and one count of carrying a dangerous weapon.[2] *Dyous II*, supra, 268. The trial court committed the acquittee to the custody of the Commissioner of Mental Health for a period not to exceed twenty-five years. Id. In March, 1985, the acquittee was transferred to the custody of the board pursuant to General Statutes § 17a-582. Id.[3]

Our Supreme Court set forth the details of the events that led to the acquittee's initial commitment to the custody of the board and subsequent events up to this third petition by the state for his continued commitment. "Between 1977 and the time of the incident [that] resulted in his criminal commitment, the [acquittee] was hospitalized three times in psychiatric facilities. Thereafter, in December, 1983, the [acquittee] hijacked a bus carrying forty-seven people, including a child. He threatened the driver with a bomb and nerve gas, and stated he had been asked by God to deliver a message. During and after this incident, the [acquittee] exhibited signs of delusional thinking and symptoms of psychosis. The [acquittee] was arrested, found not guilty by reason of [insanity] and committed . . . for a period of twenty-five years. The [acquittee] was confined to the Whiting Forensic Institute [(Whiting), a maximum security psychiatric facility] for a period of time and then transferred to . . . Norwich State Hospital.

"On January 17, 1986, the [acquittee] escaped from Norwich [State Hospital] with a female peer, and they traveled to South Carolina, to Texas and, finally, to Mexico. When [the acquittee was] located in Mexico in September, 1986, [he] exhibited symptoms of psychosis. He was returned to Connecticut and, upon admission to Whiting, was found to be grossly psychotic and expe-

riencing auditory and visual hallucinations as well as grandiose and persecutory delusions. While at Whiting, he was thereafter involved in a violent incident [that resulted in his own injuries, as well as injuries to staff members] and other patients.

"In 1989, based on his clinical stability, the [acquittee] was transferred to Norwich [State Hospital]. From [1990 through 1992], he was granted a series of temporary leaves [that] were terminated when he rendered a positive drug screen for cocaine. After a [period of] time, temporary leaves were reinstated, and, in July, 1995, he was granted a conditional leave. In June, 1996, the [acquittee] began to exhibit symptoms of psychosis and admitted that he had stopped taking his antipsychotic medication. He was admitted to Connecticut Valley Hospital but refused some of his medications. A few days later, he escaped from [that] hospital, and, several days thereafter, he was found . . . [and] returned to Whiting. At that time, he was exhibiting psychotic and paranoid symptoms, as well as delusional thinking. He became violent and was placed in four point restraints for six hours.

"During the next several years, the [acquittee] remained at Whiting and was involved in a series of assaults. From 1996 [through] 2005, the [acquittee's] behavior at Whiting was characterized by chronic refusal to take medication, irritability, mood lability, grandiosity, paranoid ideation, rule breaking, physical altercations with peers and refusal to engage meaningfully in treatment.

"In 2005, there was a reduction in the [acquittee's] aggression, an improvement in his participation in treatment and increased cooperation with his treatment team. Based on [these improvements], in mid-2006, the [acquittee] was transferred to Dutcher [Hall of Connecticut Valley Hospital], a less secure [area] on the hospital campus. Treatment records after the transfer show that the [acquittee exhibited] episodic irritability, mood instability, grandiosity, paranoid ideation and [that] he refused to take his medication, claiming [that] he could control his behavior. Ultimately, the treatment team convinced him to take . . . mood stabilizing medication, but [he then] changed his mind and refused. A treatment impasse ensued, and the [acquittee] was transferred to another unit. In the new unit, his psychiatrist noted mood lability and ongoing conflicts with peers. After working closely with the [acquittee], the psychiatrist was able to convince him to take the mood stabilizing medication, Trileptal. Even after starting Trileptal, however, the [acquittee] had another altercation with a peer and was again transferred. In December, 2009, he was transferred to yet another unit following problems with another patient.

"During his twenty-five year term of commitment to the jurisdiction of the board, the [acquittee] filed two

applications for discharge, the first in 2003 and the second in 2007. The trial court dismissed both applications. In dismissing the more recent application, the trial court observed that [t]here is little or no dispute that the [acquittee] suffers from a long-standing mental illness. . . . [O]n January 31, 2007, the [acquittee's] diagnosis included delusional disorder, grandiose and persecutory type, and, most recently, the [acquittee] has been diagnosed with schizoaffective disorder, bipolar type. The trial court also observed that [t]he evidence is undisputed that, if the [acquittee] is released [into] the community, he would require supervision and treatment and that, without such services, he would be a danger to himself or others. The court further noted that [t]he [acquittee's] history belies his representation that he will continue to engage in supervision and treatment in the community or that he is ready to be discharged without mandatory supervision. The records are replete with evidence of substance abuse, noncompliance with treatment recommendations and repeated failures to meaningfully engage in treatment. Moreover, throughout his commitment, the [acquittee] has demonstrated little insight into his illness and, instead, has sought to justify or rationalize his behavior. Additionally, despite a history of psychotic episodes, the [acquittee] remains steadfast in his opposition to taking antipsychotic medication [even] [t]hough medication has been shown to ameliorate [the acquittee's] symptoms . . . . Finally, the court observed that, even in the controlled environment of his inpatient hospitalization, the [acquittee] has repeatedly demonstrated behavior [that] has put others at risk of harm.

"In 2009, approximately one year before the end of the [acquittee's] term of commitment, the state filed a petition for an order of continued commitment, arguing that the [acquittee] remained mentally ill and that his discharge would constitute a danger to himself or others." (Internal quotation marks omitted.) *Dyous I*, supra, 307 Conn. 304–307. Our Supreme Court affirmed the judgment of the trial court granting the state's petition to extend the acquittee's commitment for an additional three years. Id., 302, 304.

On April 24, 2012, the state filed a second petition for continued commitment on the bases that the acquittee remained mentally ill and that his discharge from the custody of the board would constitute a danger to himself or others. *Dyous II*, supra, 153 Conn. App. 270. After a two day hearing, the court summarized the acquittee's history. Id., 270–71. It then set forth, in greater detail, the relevant facts that had occurred subsequent to the first extension of the acquittee's commitment. Id., 271. "In March, 2010, the [acquittee] described himself as a [prisoner of war], who was being held in violation of human rights standards. On April 26, 2010, he assaulted another patient by hitting the patient with a radio, leading to his conviction on April 8, 2011, of assault in the

third degree. Chemical tests administered at about that time revealed that for more than two years, the [acquittee] falsely had indicated that he was taking his medication; he surreptitiously was spitting out the pills.

"The court found the following events outlined in the board's report. On December 29, 2010, the [acquittee] pushed another patient to the floor and grabbed the patient by the throat. The incident ended only when hospital police intervened. In March, 2011, a female patient complained of the [acquittee's] behavior, which was characterized as sexual harassment and unwelcome (but not, apparently, criminal) touching. Between March, 2010, and June, 2012, the [acquittee's] posture toward the medical staff was influenced by his belief that his commitment was illegal. He refused to engage in therapy or to take his medication. The staff determined that the [acquittee] continued to be mentally ill and in need of medical attention. In June, 2012, the [acquittee] exhibited greater cooperation and self-control, but he continued to refuse to take his medication. The results of the [acquittee's] September 15, 2012 psychological assessment revealed that he had no current acute symptoms of bipolar disorder, and that, within an institutional setting he has refrained from using alcohol and illegal drugs.

"At the hearing on the second petition to extend the [acquittee's] commitment, the board's report to the court was placed into evidence, and Mahboob Aslam, the [acquittee's] treating psychiatrist, testified. The court noted Aslam's expert testimony that interepisodal recovery while a patient remains in a highly structured environment is common; equally common . . . is the predictability of a relapse when a person leaves that structure, as the person lacks insight into his malady, and resists taking medication and continuing in therapy.

"In its memorandum of decision, the court found that a clinical consensus existed that the [acquittee] remains mentally ill and, despite his present state of relative lucidity, needs medication, which he refuses to take, and support, which he rejects. The court also found that if the [acquittee] is to become a person who is not a danger to himself or others, he needs to take his medication and accept support. The court found by clear and convincing evidence that, at the time of the hearing, the [acquittee] presented a danger to himself or to others such that he would be a risk of imminent physical injury to others or to himself if he were released." (Internal quotation marks omitted.) *Dyous II*, supra, 153 Conn. App. 271–72. This court affirmed the extension of the defendant's commitment to March 18, 2018. See id., 267–68, 272.

The present appeal arises from the December 8, 2017 petition for an order of continued commitment filed by the state pursuant to General Statutes § 17a-593. Therein, the state represented that the acquittee

remained mentally ill to the extent that his discharge would constitute a danger to himself or others. On January 5, 2018, the board held a hearing to review the acquittee's status. See General Statutes § 17a-593 (d). Neither the acquittee nor his attorney attended this proceeding.

The report of the board summarized the acquittee's mental health history and set forth his multiple diagnoses. Ultimately, it found that he remained an individual with psychiatric disabilities and that were he discharged from the jurisdiction of the board, he would present a danger to himself or others.

On March 12, 2018, the court held a hearing on the state's petition. The board's report was admitted into evidence. Additionally, the court heard testimony from James Gusfa, the acquittee's treating psychiatrist at Whiting for the preceding eighteen months. After the presentation of evidence and arguments of counsel, the court rendered its oral decision. At the outset, it found both the board's report and Gusfa's testimony to be credible. The court then noted the seriousness of the criminal conduct in this case, and the acquittee's lack of participation in recommended treatment groups, poor insight into his mental illness and refusal to take recommended medication. It also referred to the acquittee's altercation with another patient, where the acquittee had acted in a confrontational and "very aggressive" manner. The court additionally pointed out that Gusfa could not or would not move the acquittee to a less secure setting. In conclusion, the court found, by clear and convincing evidence, that the acquittee was mentally ill and a danger to himself or others if released. Accordingly, it granted the state's petition and extended the acquittee's commitment to the board for an additional four years. This appeal followed. Additional facts will be set forth as needed.

On appeal, the acquittee claims that the court's findings that he was mentally ill, and, if released from the jurisdiction of the board, posed a danger to himself or others, were clearly erroneous. Specifically, with respect to the former, the acquittee argues that there is no evidence that the board or Gusfa had relied on the current version of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5)[4] of the American Psychiatric Association in determining the acquittee's mental health diagnosis, as required by § 17a-581-2 of the Regulations of Connecticut State Agencies. Regarding the latter, the acquittee contends that the state failed to prove, by clear and convincing evidence, that he posed a risk of imminent physical injury to himself or others if discharged from the custody of the board. We are not persuaded by either of the acquittee's arguments.

We begin with a review of our jurisprudence regarding the board and acquittees and then set forth our

standard of review. When a criminal defendant is found not guilty by reason of mental disease or defect; see General Statutes § 53a-13;[5] the court holds a hearing to assess that individual's mental status and to determine whether confinement or release is appropriate.[6] See *State* v. *Harris*, 277 Conn. 378, 382–83, 890 A.2d 559 (2006); see also General Statutes § 17a-582 (a) and (e); *State* v. *Kelly*, 95 Conn. App. 31, 33–34, 895 A.2d 801 (2006). If the acquittee fails to meet his burden of proof that he should be discharged, the court must commit the acquittee to the jurisdiction of the board for a term not exceeding the maximum sentence that could have been imposed had there been a criminal conviction. See *State* v. *Harris*, supra, 383. The board determines where to confine the acquittee and holds hearings and periodically reviews the progress of the acquittee to determine whether conditional release or discharge is warranted. See id.; see also General Statutes §§ 17a-583 through 17a-592. The acquittee also may apply periodically to be discharged from the board's jurisdiction. See General Statutes § 17a-593 (a)–(d); *State* v. *Vasquez*, 194 Conn. App. 831, 836–37, 222 A.3d 1018 (2019), cert. denied, 334 Conn. 922, 223 A.3d 61 (2020); *State* v. *Jacob*, 69 Conn. App. 666, 669, 798 A.2d 974 (2002). This confinement, although resulting initially from an adjudication in the criminal justice system, does not constitute a punishment; rather, it serves the purposes of treating the acquittee's mental illness and protecting the acquittee and society. See *State* v. *Damone*, 148 Conn. App. 137, 164–65, 83 A.3d 1227, cert. denied, 311 Conn. 936, 88 A.3d 550 (2014); see also *State* v. *Harris*, supra, 277 Conn. 394 (primary purposes of commitment are treatment of mental illness and protection of society, not punishment of acquittee); *Payne* v. *Fairfield Hills Hospital*, supra, 215 Conn. 683–84 (same); see generally General Statutes § 17-593a (g) (at continued commitment hearing, primary concern is protection of society). "The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous. . . . As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness." (Internal quotation marks omitted.) *State* v. *Damone*, supra, 165.

At the conclusion of the commitment period, the state has the option to seek an extension.[7] "When an acquittee reaches the end of the definite term of commitment set by the court, the state may submit a petition for continued commitment if reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities . . . to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others . . . . General Statutes § 17a-593 (c).[8] After the state files its petition, the board is required, by statute, to submit a report to the court setting forth the board's findings and conclusions as to whether discharge is warranted.

General Statutes § 17a-593 (d).[9] When making its decision, the Superior Court is not bound by the board's recommendation, but considers the board's report in addition to other evidence presented by both parties and makes its own finding as to the mental condition of the acquittee . . . ." (Footnotes added; internal quotation marks omitted.) *State* v. *Harris*, supra, 277 Conn. 384; see also *Dyous I*, supra, 307 Conn. 307–309. At this proceeding, the state must prove the need for continued commitment by demonstrating, under the clear and convincing evidence standard, "that the acquittee is currently mentally ill and dangerous to himself or herself . . . ." (Internal quotation marks omitted.) *State* v. *Harris*, supra, 386; see also *Dyous I*, supra, 307 Conn. 308; *State* v. *Metz*, 230 Conn. 400, 425–26, 645 A.2d 965 (1994); *State* v. *Damone*, supra, 148 Conn. App. 164. At this proceeding, however, the court's primary concern is the protection of society. *Dyous I*, supra, 308–309.

We turn now to our standard of review. "The determination as to whether an acquittee is currently mentally ill to the extent that he would pose a danger to himself or the community if discharged is a question of fact and, therefore, our review of this finding is governed by the clearly erroneous standard. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . . Conclusions are not erroneous unless they violate law, logic or reason or are inconsistent with the subordinate facts. The court's conclusions are to be tested by the findings and not the evidence. . . . Conclusions logically supported by the finding must stand." (Citation omitted; internal quotation marks omitted.) *State* v. *Damone*, supra, 148 Conn. App. 165; see also *State* v. *Maskiell*, 100 Conn. App. 507, 521, 918 A.2d 293, cert. denied, 282 Conn. 922, 925 A.2d 1104 (2007); *State* v. *Jacob*, supra, 69 Conn. App. 680.

The acquittee first argues that the court improperly found that he suffered from a mental illness at the time of the state's third petition. Specifically, he contends that neither the board's report nor Gusfa's testimony, the two evidentiary sources presented to the court at the hearing, referred to the DSM-5, and, in light of this "evidentiary void," the court's finding of his mental illness cannot stand.

We begin with the controlling statutory language. Section 17a-593 (c) provides: "If reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities or a person with intellectual disability to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others, the state's attorney, at least one hundred thirty-five days prior to such expira-

tion, may petition the court for an order of continued commitment of the acquittee." General Statutes § 17a-580 (7) provides that " '[p]sychiatric disability' includes any mental illness in a state of remission when the illness may, with reasonable medical probability, become active. 'Psychiatric disability' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct . . . ."

In *State* v. *March*, 265 Conn. 697, 704, 706–707, 830 A.2d 212 (2003), our Supreme Court interpreted the terms "psychiatric disabilities" and "mental illness or mental disease."[10] After setting forth the applicable statutes and regulations, the court concluded: "*Mental illness means any mental illness or mental disease as defined by the current Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association* and as may hereafter be amended." (Emphasis added; internal quotation marks omitted.) *State* v. *March*, supra, 706–707; see also *State* v. *Vasquez*, supra, 194 Conn. App. 838–39; *State* v. *Kalman*, 88 Conn. App. 125, 138, 868 A.2d 766, cert. denied, 273 Conn. 938, 875 A.2d 44 (2005).

The report of the board, which was admitted into evidence as an exhibit at the court's March 12, 2018 hearing, set forth the following findings of fact: "[The acquittee] is a psychiatrically ill individual with the diagnoses of Bipolar Disorder, Most Recent Episode Hypomanic, [i]n Full Remission; Unspecified Personality Disorder, With Paranoid, Narcissistic and Antisocial Traits and Alcohol and Cannabis Use Disorder [i]n Sustained Remission [i]n A Controlled Environment. Since the [b]oard's last report to [the] court dated December 27, 2012, [the acquittee] has remained confined in maximum security, where he has resided since September, 2010. [The acquittee] had a lengthy psychiatric history with intermittent episodes of assaultive and aggressive behavior, treatment noncompliance and two escapes from treatment settings.

"[The acquittee] recently demonstrated some improvement in his treatment group participation. However, he has resisted attempts to encourage and motivate him to transfer to a less restrictive hospital setting, maintaining a fixed belief that he has been illegally confined. Despite his many years of inpatient treatment, [the acquittee] has poor insight into the mental illness that brought him under the jurisdiction of the [b]oard or the need for treatment and medication. Even within the highly structured and supervised maximum security setting, he has been uncooperative with treatment and medication recommendations. As a result, his treatment team has been unable to adequately assess his risk, frustrating their efforts to aid his progress. Additionally, given that [the acquittee] has not resided in the community since 1996, he does not have an established support network available to assist him if discharged. Based on

the aforementioned, the [b]oard finds that [the acquittee] cannot currently reside safely in the community and should remain under the jurisdiction of the [b]oard.

"From the preceding facts, the [b]oard concludes that the evidence is clear and convincing that [the acquittee] remains an individual with psychiatric disabilities to the extent that his discharge from the jurisdiction of the [b]oard would constitute a danger to himself or others."

Gusfa testified at the March 12, 2018 court hearing that he had been treating the acquittee for approximately eighteen months. He testified that he would not recommend that the acquittee be transferred from maximum security to a less restrictive setting due to his lack of participation with his treatment team. Gusfa also indicated that the acquittee had "poor" insight into his psychiatric illness and his need for medication and continued treatment. He opined that, given the acquittee's historical risk factors, he would be vulnerable to psychiatric regression and at risk behaviors without a structured environment and intense mental health support. On cross-examination, Gusfa stated that the acquittee presently was diagnosed with bipolar disorder. On redirect examination, Gusfa testified that the acquittee would benefit from psychiatric medication and that his refusal to be medicated constituted an ongoing risk factor. Neither the board nor Gusfa specifically mentioned or referred to the DSM-5.

The court found both the board's report and Gusfa's testimony to be credible. It then made the following findings: "[The] court is particularly taken, but not exclusively taken, by the fact that . . . this was a serious crime to begin with, extremely serious crime. And that since that time and especially since . . . Gusfa's been involved, the—[the acquittee] is minimally involved in treatment. He doesn't participate in the recommended groups; he refuses to meet with the teams. He has poor insight into his mental illness. He refused to take the medication which has been recommended.

"At least in a second altercation with another patient, according to the doctor, which the court credits, [the acquittee] became more than a little confrontational and very aggressive. And he's—while he's okay, he can participate in [a] maximum security setting, he—he can't—[Gusfa] cannot or would not put him in a less secure setting.

"So based upon all those risk factors, the court finds it's clearly—it's clear and convincing evidence that the acquittee is mentally ill. He's mentally ill—[in] that he's got bipolar disorder, most recent episode hypomania, manic, unspecified personality disorder with paranoid narcissistic and antisocial traits."

The question, therefore, is whether the court's finding that the acquittee, at the time of the December 8, 2017

petition to extend his commitment, suffered from a mental illness, as defined by our statutes and regulations, was clearly erroneous when neither the board's report nor the sole witness to testify at the hearing specifically mentioned the DSM-5. We conclude that it was not.[11]

The board conducted its hearing on January 5, 2018, to review the acquittee's status in response to the state's petition and issued its report approximately two weeks later on January 22, 2018. The composition of the board is noteworthy. "The . . . board is a six member autonomous, administrative body within the [D]epartment of [M]ental [H]ealth and [A]ddiction [S]ervices that oversees the involuntary commitment of people found not guilty by reason of mental disease or defect. . . . The board's membership must include a psychiatrist, a psychologist, a probation expert, a layperson, an attorney who is licensed in Connecticut, and a layperson with experience in victim advocacy. General Statutes § 17a-581 (b)." (Citations omitted.) *State* v. *Harris*, supra, 277 Conn. 381 n.5; see also *State* v. *Long*, 268 Conn. 508, 519–20, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004).[12] Under the acquittee statutory scheme, the board possesses general and specific familiarity with all acquittees and is better equipped than the courts to monitor their commitment. *State* v. *Long*, supra, 536.

At the outset of its report, each of the participating board members attested that he or she was present at the hearing, had reviewed the record, and that the report issued to the court was "*based entirely on the record, the law, and the [b]oard's specialized knowledge and familiarity with the acquittee.*" (Emphasis added.) Inherent in these statements is a recognition by the members of the board of the applicable statutes; see General Statutes §§ 17a-580 (7) and 17a-593 (c); regulations; see Regs., Conn. State Agencies § 17a-281 (2) (a) (5); and the case law interpreting those items. As our Supreme Court explained in *State* v. *March*, supra, 265 Conn. 706–709, the applicable statutes and regulations, when read in concert, establish the requirement that the board use the current Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association[13] in determining mental illness. The board, with its expertise and general and specific knowledge of acquittees that furthers the legislative goal of the efficient management of the recommitment process; see *State* v. *Long*, supra, 268 Conn. 536; would be aware of the applicable definition of mental illness. See also *Dyous I*, supra, 307 Conn. 324 (system applicable to acquittees accords central role to board).

In light of the educational and professional backgrounds of the members of the board, and their attestations that the report was based on the controlling law, we disagree with the acquittee that the court's finding

of mental illness was clearly erroneous. The detailed information in the board's report, coupled with Gusfa's testimony, support the court's finding that the acquittee suffered from a mental illness despite the absence of a specific reference to the DSM-5. As a general matter, "Connecticut courts have refused to attach talismanic significance to the presence or absence of particular words or phrases." *State* v. *Janulawicz*, 95 Conn. App. 569, 576 n.6, 897 A.2d 689 (2006); see also *State* v. *Damone*, supra, 148 Conn. App. 166–67 (failure to use "magic words" did not render finding that acquittee suffered from mental illness clearly erroneous (internal quotation marks omitted));[14] *State* v. *Peters*, 89 Conn. App. 141, 146, 872 A.2d 532 (court's failure to use term "psychiatric disabilities" before finding that acquittee's commitment should be extended did not warrant reversal under plain error doctrine where court clearly made findings regarding condition of acquittee that met definition of that term), cert. denied, 274 Conn. 918, 879 A.2d 895 (2005). Accordingly, we conclude that the court's finding of mental illness was not clearly erroneous.

Next, we turn to the acquittee's contention that the court's finding that he would present a danger to himself or others as a result of his mental illness if released from the jurisdiction of the board was clearly erroneous. Specifically, the acquittee contends that the court placed too much emphasis on the original incident in 1983 and that the evidence, as a whole, did not rise to level necessary to extend his commitment. After reviewing the totality of the record, we cannot conclude that the court's finding of dangerousness was clearly erroneous.

In *State* v. *March*, supra, 265 Conn. 709, our Supreme Court interpreted the phrase "[d]anger to self or others . . . [to mean] the risk of imminent physical injury to others or self, including the risk of loss or destruction of the property of others." (Citation omitted; footnote omitted; internal quotation marks omitted.). See *State* v. *Kelly*, supra, 95 Conn. App. 35; see also *State* v. *Damone*, supra, 148 Conn. App. 170 n.15 ("The regulations define danger to self or others as the risk of imminent physical injury to others or self, and also includes the risk of loss or destruction of the property of others. . . . Imminent is defined as ready to take place; esp: hanging threateningly over one's head . . . ." (Citation omitted; internal quotation marks omitted.)).

We iterate that the determination of whether an acquittee posed a danger to himself or others such that his commitment to the jurisdiction of the board should be extended presents a question of fact subject to the deferential clearly erroneous standard of review. See *State* v. *March*, supra, 265 Conn. 709, 711. A finding is clearly erroneous when there is no evidence in the record to support it or when there is some evidentiary support but nonetheless the reviewing court, on the

entire evidence, is left with definite and firm conviction that a mistake has been committed. See, e.g., *State* v. *Maskiell*, supra, 100 Conn. App. 521. Finally, we are mindful of our limited role in this process. "In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority . . . is circumscribed by the deference we must give to [the] decisions of the [trial court], who is usually in a superior position to appraise and weigh the evidence." (Internal quotation marks omitted.) *State* v. *Jacob*, supra, 69 Conn. App. 680.

In making the factual finding regarding dangerousness, the trial court balances the different, and sometimes competing, considerations at issue. "[T]he goals of a treating psychiatrist frequently conflict with the goals of the criminal justice system. . . . While the psychiatrist must be concerned primarily with therapeutic goals, the court must give priority to the public safety ramifications of releasing from confinement an individual who has already shown a propensity for violence. As a result, the determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the defendant must be balanced against the security interests of society. . . . The awesome task of weighing these two interests and arriving at a decision concerning release rests finally with the trial court." (Internal quotation marks omitted.) *State* v. *March*, supra, 265 Conn. 712; see *State* v. *Jacob*, supra, 69 Conn. App. 677; see also *State* v. *Harris*, supra, 277 Conn. 384 (court not bound by board's report but considers additional evidence and makes own finding as to acquittee's mental condition); *State* v. *Putnoki*, 200 Conn. 208, 221, 510 A.2d 1329 (1986) (determination of dangerousness in context of mental status hearing reflects societal, rather than medical, judgement). Most importantly, "[t]he *ultimate determination of mental illness and dangerousness is a legal decision . . . in which the court may and should consider the entire record available to it, including the [acquittee's] history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released*." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Damone*, supra, 148 Conn. App. 171; see also *State* v. *Jacob*, supra, 681 (although court may choose to attach special weight to testimony of experts at hearing, ultimate determination of mental illness and dangerousness is legal decision).

Here, the court credited both the board's report and Gusfa's testimony. The board specifically found that the acquittee has a lengthy psychiatric history with intermittent episodes of assaultive and aggressive

behavior, treatment noncompliance and two escapes from treatment settings. The board noted some recent improved participation in his treatment group, but also commented on his resistance to attempts to encourage and motivate him to transfer to a less restrictive hospital setting. The board also observed that, despite his many years of treatment, the acquittee demonstrated poor insight into his mental illness, or the need for treatment and medication. It also stated that even in the highly structured supervised maximum security setting, the acquittee had not cooperated with treatment and medication recommendations, frustrating efforts by his treatment team to aid his progress. Finally, the board indicated that the acquittee lacked an established support network in the community. In addition to its general acceptance of the board's report, the court, in its oral decision, referenced many of the board's specific comments in support of its finding that the acquittee was a danger to himself or others.

Additionally, the board noted in its report that, in 2013, the acquittee had made a "veiled threat" directed at one of his treating psychiatrists and left a "concerning voicemail" for the chief executive officer of Connecticut Valley Hospital. Around that time, the acquittee also "lunged at" and "picked up a side table and threw it at" a nurse after being offered prescribed medication. After being placed in restraints, the acquittee threatened an on call psychiatrist and the unit director. After being transferred to a different unit, the acquittee did not act in an aggressive manner, but he continued to refuse to meet with his treatment team as a whole, resulting in the team's inability to fully assess his risk and protective factors.

There was also evidence in the board's report that the acquittee's poor acceptance and understanding of his mental illness contributed to the actions regarding the hijacking of the bus and that his risk factors include alcohol and marijuana abuse. The report also indicated that the acquittee "has a history of failing [c]onditional [r]elease, escape from the hospital, medication noncompliance and deceptiveness about his medication noncompliance." The report noted that the acquittee's psychiatric treatment has been largely unsuccessful and that he continued to demonstrate a paranoid world view. Although the acquittee was not considered to be an acute risk in his current highly structured maximum security environment, his oppositional attitude and history of escape hindered the acquittee's ability to move to a less secure setting. Gusfa opined to the board that the acquittee "was capable of impulsive behavior without any regard to his mental health needs in a less structured setting," and that he "did not have much confidence that [the acquittee] would stay allied with therapeutic supports in a [less restrictive environment]." Gusfa also expressed a concern that the effects of additional stressors, such as substance abuse, could

leave the acquittee more prone to acute psychiatric decompensations. In sum, Gusfa believed that the acquittee "had not yet attained an adequate level of clinical stability to permit his return to the community."

The court properly considered the totality of the evidence in finding that the acquittee presented a danger to himself or others if released from the jurisdiction of the board. See *State* v. *Putnoki*, supra, 200 Conn. 221; *State* v. *Jacob*, supra, 69 Conn. App. 688. That calculus included a review of the acquittee's lengthy struggle with mental illness,[15] his failure to cooperate with treatment and medication recommendations and his past violent behaviors and mental health decompensations when outside of a maximum security setting. "[I]t also comports with common sense to conclude . . . that someone whose mental illness was sufficient to lead him to commit a dangerous crime, and whose mental illness demonstrably has persisted despite years of intensive treatment, is someone whose prospective release raises a special concern for public safety." *Dyous I*, supra, 307 Conn. 329. The evidence supports the court's finding that, if the acquittee were to be released from the jurisdiction of the board, he would pose a danger to himself or others. *State* v. *Damone*, supra, 148 Conn. App. 175. After reviewing the totality of the evidence, we conclude that the court's finding of dangerousness was not clearly erroneous. The defendant's claim, therefore, must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] "[An] [a]cquittee is any person found not guilty by reason of mental disease or defect pursuant to [General Statutes] § 53a-13 . . . ." (Internal quotation marks omitted.) *State* v. *Vasquez*, 194 Conn. App. 831, 832 n.1, 222 A.3d 1018 (2019), cert. denied, 334 Conn. 922, 223 A.3d 61 (2020); see also General Statutes § 17a-580 (1); Regs., Conn. State Agencies § 17a-581-2 (a) (2).

[2] See General Statutes §§ 53a-92 (a) (1), 53a-62 (a) (1) and 53-206, respectively.

[3] See generally *Payne* v. *Fairfield Hills Hospital*, 215 Conn. 675, 682–83 n.5, 578 A.2d 1025 (1990) (noting statutory enactments that created and empowered board, including its jurisdiction over all acquittees confined prior to its effective date).

[4] The acquittee's counsel sent a letter, pursuant to Practice Book § 67-10, to this court confirming that the DSM-5 was published in 2013.

[5] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

Our Supreme Court has noted that "[a] verdict of not guilty by reason of mental disease or defect establishes two facts: (1) the person committed an act that constitutes a criminal offense; and (2) he committed the act because of mental illness." *State* v. *Long*, 268 Conn. 508, 540, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004).

[6] "The statutory scheme that applies to . . . acquittees can be found at General Statutes §§ 17a-580 through 17a-603, inclusive." *State* v. *Jacob*, 69 Conn. App. 666, 675 n.8, 798 A.2d 974 (2002).

[7] Until the maximum period of confinement has expired, if the acquittee seeks a discharge from the board's jurisdiction, he or she must show by a preponderance of the evidence that he is not dangerous. Thereafter, "if the state seeks to continue the acquittee's commitment, it must then carry the burden of proving by clear and convincing evidence that the acquittee is

mentally ill and dangerous." *State* v. *Jacob*, supra, 69 Conn. App. 687.

[8] General Statutes § 17a-593 (c) provides: "If reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities or a person with intellectual disability to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others, the state's attorney, at least one hundred thirty-five days prior to such expiration, may petition the court for an order of continued commitment of the acquittee." Our Supreme Court has held that the time frame for the filing of the petition to extend a commitment is directory and not subject to dismissal on the grounds of untimeliness unless such delay has prejudiced the acquittee. *State* v. *Metz*, 230 Conn. 400, 408–11, 645 A.2d 965 (1994).

[9] General Statutes § 17a-593 (d) provides: "The court shall forward any application for discharge received from the acquittee and any petition for continued commitment of the acquittee to the board. The board shall, within ninety days of its receipt of the application or petition, file a report with the court, and send a copy thereof to the state's attorney and counsel for the acquittee, setting forth its findings and conclusions as to whether the acquittee is a person who should be discharged. The board may hold a hearing or take other action appropriate to assist it in preparing its report."

[10] The terms "psychiatric disabilities" and "mental illness or mental disease" may be used interchangeably with respect to the statutes and regulations at issue in the present case. See *State* v. *March*, supra, 265 Conn. 707 n.13.

[11] We do note that it would be a better practice for the state to present evidence that an acquittee's diagnosis of a mental illness is based on the current Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association when seeking to extend a commitment pursuant to § 17a-593 (c).

[12] In the present case, the board acted with five members: "Sheila Hennessey, [an attorney], Cheryl Abrams, M.S., Susan Blair, M.S., Mark Kirschner, Ph.D. and Hassan Minhas, M.D." General Statutes § 17a-581 (g) provides in relevant part that "[a] majority of the members of the board constitutes a quorum for the transaction of business . . . ."

[13] This manual has been broadly accepted and recognized as "an objective authority on the subject of mental disorders . . . ." (Internal quotation marks omitted.) *Fuentes* v. *Griffin*, 829 F.3d 233, 249 (2d. Cir. 2016). We note that the diagnoses set forth in the board's report and mentioned by Gusfa are found in the DSM-5. See American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (5th Ed. 2013) pp. 126–27 (bipolar I disorder, most recent episode hypomanic in full remission); id., 490–91 (alcohol use disorder in sustained remission in controlled environment); id., 509–10 (cannabis use disorder in sustained remission in controlled environment); id., 684 (unspecified personality disorder); id., pp. 841–42, 844, 850, 856 (listing of diagnostic codes, including antisocial personality disorder, narcissistic personality disorder and paranoid personality disorder). We further note that, in the past, the acquittee has conceded the fact that he suffered from a mental illness. See *Dyous II*, supra, 153 Conn. App. 281.

[14] In *State* v. *Damone*, supra, 148 Conn. App. 162–63, the trial court, in concluding that the state had met its burden of proof to extend the acquittee's commitment, concluded that, although the acquittee was clinically stable in his controlled environment, "if removed from that controlled environment, [the acquittee] is at a great risk to mentally relapse." (Internal quotation marks omitted.) On appeal, the acquittee argued that the state had failed to prove that his mental illness may become active with a reasonable degree of medical certainty. Id., 166. This court disagreed, noting first that formulaic or talismanic words were unnecessary under our law. Id., 167. We then concluded that the evidence supported the finding of a "great risk [of] relapse" and therefore the court's finding of mental illness was not clearly erroneous. (Internal quotation marks omitted.) Id. This reasoning applies to the present case, where the evidence, taken as a whole, supports the finding of mental illness, even in the absence of a specific reference to the DSM-5.

[15] Our Supreme Court has stated: "It is true that the court should take into consideration the acquittee's past and present diagnoses in assessing dangerousness for purposes of a § 17a-593 discharge hearing." *State* v. *March*, supra, 265 Conn. 716.