******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* FRANKLIN FOSTER
## (AC 44043)

Cradle, Suarez and Seeley, Js.

*Syllabus*

The acquittee, who had been found not guilty of the crimes of burglary in the first degree, risk of injury to a minor, assault in the third degree and possession of weapon on school grounds, appealed to this court from the judgment of the trial court granting the state's petition seeking his continued commitment to the jurisdiction of the Psychiatric Security Review Board pursuant to statute (§ 17a-593). *Held*:

1. The trial court did not err in finding that the state met its burden under § 17a-593, governing continued commitment to the board, of establishing by clear and convincing evidence that the acquittee currently was mentally ill and posed a risk of imminent harm to himself or others: contrary to the acquittee's claim, the court's statements, in which it expressed concern for the welfare of schoolchildren and women, were not improper, as the court's references to the well-being of schoolchildren was logically linked to the offenses for which the acquittee was prosecuted, and the court did not suggest or explicitly state that the acquittee had engaged in subsequent acts of violence toward a schoolchild, and the court's reference to the well-being of women logically was related to the records of the acquittee's confinement that were submitted in evidence, those records reflecting that the acquittee's treatment history during his commitment included several instances in which he intimidated, inappropriately touched, or made socially inappropriate statements to female staff members; moreover, the court could have found that, although under his current level of board supervision the acquittee did not pose an imminent risk of physical injury to himself or others, it was likely that he would pose an imminent risk of physical injury to himself or others if he were to be released from the board's supervision entirely because the evidence before the court logically supported a finding that he would risk relapse once outside of his present controlled environment and present an imminent danger to himself or to others; furthermore, the acquittee was unable to demonstrate that the court erred in determining, based on the board's report filed with the court, that he did not have a sufficient history of being in a conditional release status to support a conclusion that he could live in the community without board oversight.

2. The trial court did not improperly reject the acquittee's claim that the recommitment procedure to which he was subjected under § 17a-593, as applied to him, violated his right to equal protection guaranteed by the federal constitution: the acquittee failed to establish the necessary predicate for purposes of equal protection analysis, namely, that he was similarly situated to civilly committed inmates, for the acquittee, to have prevailed at his criminal trial on his insanity defense, had to prove that there was a nexus between his mental illness and his violent criminal conduct, and, in the civil commitment process, such a proven correlation between mental illness and criminal conduct did not need to exist, and the acquittee did not satisfactorily address the difference in circumstances; moreover, this court was not persuaded that, in light of the continued danger that the acquittee posed to others due to his mental illness, his progress in treatment or the fact that he had reached the end of his maximum term of confinement should have led it to conclude that he was similarly situated to inmates whose mental illness had not manifested in criminal conduct, and these facts did not alter the significance of the circumstances that led to the acquittee's commitment, let alone undermine the fact that his mental illness continued to pose a danger to society.

*(One judge concurring separately)*

Argued September 12, 2022—officially released February 7, 2023

*Procedural History*

Petition for an order extending the acquittee's commitment to the Psychiatric Security Review Board, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number one, where the court, *Hon. Richard F. Comerford, Jr.*, judge trial referee, denied the acquittee's motions to dismiss and to strike; thereafter, the matter was tried to the court, *Hon. Richard F. Comerford, Jr.*, judge trial referee; judgment granting the petition, from which the acquittee appealed to this court. *Affirmed.*

*Richard E. Condon, Jr.*, senior assistant public defender, for the appellant (acquittee).

*James M. Ralls*, special assistant state's attorney, with whom, on the brief, were *Paul J. Ferencek*, state's attorney, and *Maureen Ornousky*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SUAREZ, J. The acquittee, Franklin Foster, appeals from the judgment of the trial court granting the state's petition seeking his continued commitment to the jurisdiction of the Psychiatric Security Review Board (board) pursuant to General Statutes § 17a-593. The acquittee claims that the court improperly (1) found that the state had proven by clear and convincing evidence that he suffered from a mental illness resulting in his being a danger to himself or others and (2) rejected his claim that § 17a-593, as applied to him, violates his right to equal protection guaranteed by the federal constitution. We affirm the judgment of the trial court.

The following undisputed facts and procedural history underlie the present appeal. In 2002, following a trial before the court, *Hon. William F. Hickey, Jr.*, judge trial referee, the acquittee was found not guilty by reason of mental disease or defect under General Statutes § 53a-13 with respect to the following offenses: burglary in the first degree in violation of General Statutes (Rev. to 2001) § 53a-101 (a) (2); risk of injury to a minor in violation of General Statutes § 53-21 (a) (1); two counts of assault in the third degree in violation of General Statutes § 53a-61 (a) (1); and two counts of possession of a weapon on school grounds in violation of General Statutes § 53a-217b (a) (1). The facts underlying the offenses are not in dispute. On January 16, 2001, the acquittee, then twenty-four years old, entered a Greenwich middle school while in possession of two knives. In a school hallway, the acquittee slapped, punched, and kicked a male sixth grade student, and he lifted a female sixth grade student over his head. The acquittee was on school grounds without permission and his violent conduct was unprovoked.[1] When the acquittee was asked by the police why he was at the school, he responded, "I'm here to fight the first person I see. Both of us were in the wrong place at the wrong time." On April 2, 2003, the court committed the acquittee to the jurisdiction of the board for a period of time not to exceed ten years, and the acquittee was subsequently admitted to a psychiatric hospital. By agreement of the parties, the acquittee's commitment was continued by the court for one year in 2013, two years in 2014, two years in 2016, and one year in 2018. On July 24, 2018, the acquittee was granted conditional release, at which time he was discharged from the hospital and began living in the community. His release in the community was conditioned upon his compliance with several requirements pertaining to his ongoing mental health treatment.

On July 9, 2019, the state filed a petition for continued commitment pursuant to § 17a-593. Therein, it alleged that "[t]he state is of the opinion that reasonable cause exists to believe that the acquittee continues to be a

danger to himself or others if discharged" and that "without continued supervision by the board, [the acquittee] would quickly decompensate and become a risk." Thereafter, the acquittee filed a motion to dismiss the petition as well as an accompanying memorandum of law in which he relied on equal protection grounds. In broad terms, the acquittee argued that the recommitment procedure that applies to him as *a committed acquittee* pursuant to § 17a-593 differs from the recommitment procedure that applies to *civilly committed inmates* pursuant to General Statutes § 17a-515.[2] Although the acquittee does not define the term "civilly committed inmates" with specificity, courts in prior cases have defined such persons as "mentally ill, convicted defendants who were transferred, pursuant to General Statutes §§ 17a-498 and 17a-515, to a psychiatric facility while they were serving their sentences, and whom the state seeks to commit to a similar institution after their sentences end." (Footnote omitted.) *State* v. *Dyous*, 307 Conn. 299, 301, 53 A.3d 153 (2012); see also *State* v. *Long*, 268 Conn. 508, 514, 847 A.2d 862 (defining "civilly committed inmates" as "convicted prisoners who subsequently are civilly committed to a mental hospital at some point after they have been incarcerated"), cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004). The acquittee also argued that such disparate treatment of similarly situated persons cannot withstand intermediate scrutiny under the equal protection clause of the federal constitution. On August 27, 2019, the board filed with the court a report in which it recommended that the acquittee's commitment be extended for a period of time not to exceed five years. On November 12, 2019, the acquittee filed a motion to strike the portion of the board's report filed with the court that recommended that the acquittee's commitment be extended for five years, and he referred to arguments that he made in his memorandum of law he filed in support of his motion to dismiss.

In December, 2019, the court, *Hon. Richard F. Comerford, Jr.*, judge trial referee, held a hearing related to the acquittee's motions and the state's petition. In oral rulings, the court denied the motion to dismiss the petition and the motion to strike the board's recommendation. On December 18, 2019, the court issued a memorandum of decision granting the state's petition to extend the acquittee's commitment, for a period of two years, until December 23, 2021.

On March 16, 2020, the acquittee filed the present appeal. On May 5, 2020, the acquittee filed a motion for rectification in which he argued that, in its memorandum of decision, the court mistakenly stated that he had been acquitted of two counts of possession of *a firearm* on school grounds, rather than two counts of possession of *a weapon* on school grounds. On September 30, 2020, the court held a rectification hearing, during which it stated that the acquittee's request for rectifi-

cation was appropriate.

On March 26, 2021, the court, *White, J.*, issued a corrected memorandum of decision in which it reiterated the findings and conclusions that had been set forth in Judge Comerford's original memorandum of decision, thereby granting the petition for a period of two years. In the corrected memorandum of decision, however, the court addressed the grounds for the acquittee's motion for rectification by stating that the acquittee had been acquitted of two counts of possession of a weapon on school grounds. The court also incorporated by reference statements made by Judge Comerford during the rectification hearing.[3] Additional facts and procedural history will be discussed as necessary.

I

First, the acquittee claims that the court improperly found that the state had proven by clear and convincing evidence that he suffered from a mental illness resulting in his being a danger to himself or others. Specifically, he claims that the state was required, but failed, to establish by clear and convincing evidence that he posed a risk of imminent physical injury to himself or others, meaning a risk that physical injury is "ready to take place" or is "hanging threateningly over one's head." (Internal quotation marks omitted.) We are not persuaded.

In its corrected memorandum of decision, the court stated: "The court finds that the state has established by clear and convincing evidence that . . . [the acquittee] suffers from a psychiatric illness diagnosed as: schizoaffective disorder bi-polar type . . . borderline intellectual functioning . . . inappropriate and impulsive behaviors especially toward females . . . [and] frustration difficulties.

"While the record indicates progress, his current release into the community is stable because of substantial supervision and support. These mandated safeguards and supervision, including a required pharmaceutical regime, are necessary to avoid increasing his risk to himself and the community. While [the acquittee] has expressed [to his conditional release supervisor, Madeline Rodriguez] an intent . . . to voluntarily comply with mandated safeguards, a sufficient period of time in conditional release status has not passed for the court to give great weight to any such self-represented intent. Based on the reliable and probative evidence, the significant nature of the underlying criminal behavior, and the history of [the acquittee], the court finds that he cannot reside in the community without [the board's] continued oversight and support. . . .

"[The acquittee] remains an individual with psychiatric disabilities and he would constitute a danger to himself or others if discharged from [the board's] juris-

diction.”

In its decision, the court also stated that it “incorporates by reference its oral remarks regarding the rationale involved in the court’s ultimate decisions on the motion to dismiss, motion to strike, and the state’s petition, made at the hearing on [the acquittee’s] motion for rectification on September 30, 2021 . . . .” At the rectification hearing, the court explained: “[M]y interest is in the protection of schoolchildren, number one. And number two, the secondary rationale . . . . I’m concerned about the security of women and their person. Irrespective of what the cause is, I am concerned . . . that . . . women in [our] society be protected from any kind of irrational behavior or inappropriate behavior. And certainly, I’m concerned with the safety and welfare of our schoolchildren here today.”

Having discussed the court’s findings, we set forth the applicable legal principles and our standard of review. The court’s authority to continue an acquittee’s commitment to the board is governed by § 17a-593.[4] “When a criminal defendant is found not guilty by reason of mental disease or defect; see General Statutes § 53a-13; the court holds a hearing to assess that individual’s mental status and to determine whether confinement or release is appropriate. . . . If the acquittee fails to meet his burden of proof that he should be discharged, the court must commit the acquittee to the jurisdiction of the board for a term not exceeding the maximum sentence that could have been imposed had there been a criminal conviction. . . . The board determines where to confine the acquittee and holds hearings and periodically reviews the progress of the acquittee to determine whether conditional release or discharge is warranted. . . . The acquittee also may apply periodically to be discharged from the board’s jurisdiction. . . . This confinement, although resulting initially from an adjudication in the criminal justice system, does not constitute a punishment; rather, it serves the purposes of treating the acquittee’s mental illness and protecting the acquittee and society. . . . The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous. . . . As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness. . . .

“At the conclusion of the commitment period, the state has the option to seek an extension. When an acquittee reaches the end of the definite term of commitment set by the court, the state may submit a petition for continued commitment if reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities . . . to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others . . . . After the state files its petition, the board is required, by statute, to submit a report to the court

setting forth the board's findings and conclusions as to whether discharge is warranted. . . . When making its decision, the Superior Court is not bound by the board's recommendation, but considers the board's report in addition to other evidence presented by both parties and makes its own finding as to the mental condition of the acquittee . . . . At this proceeding, the state must prove the need for continued commitment by demonstrating, under the clear and convincing evidence standard, that the acquittee is currently mentally ill and dangerous to himself or herself [or others] . . . . At this proceeding, however, the court's primary concern is the protection of society. . . .

"The determination as to whether an acquittee is currently mentally ill to the extent that he would pose a danger to himself or the community if discharged is a question of fact and, therefore, our review of this finding is governed by the clearly erroneous standard. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . . Conclusions are not erroneous unless they violate law, logic or reason or are inconsistent with the subordinate facts. The court's conclusions are to be tested by the findings and not the evidence. . . . Conclusions logically supported by the finding must stand." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Dyous*, 198 Conn. App. 253, 261–65, 233 A.3d 1138, cert. denied, 335 Conn. 948, 238 A.3d 17 (2020). "In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority . . . is circumscribed by the deference we must give to [the] decisions of the [trial court], who is usually in a superior position to appraise and weigh the evidence." (Internal quotation marks omitted.) Id., 272.

Moreover, we recognize that "our decisional law characterizes as difficult the task of the trial court in evaluating an acquittee's mental state and evaluating his dangerousness. It is, of course, not easy to predict future behavior. . . . Predictions of future dangerousness are difficult for both psychiatrists and the courts to make because of the inherent vagueness of the concept itself, and such determinations must be dealt with by trial courts to a considerable extent on a case-by-case basis." (Internal quotation marks omitted.) *State* v. *Warren*, 100 Conn. App. 407, 423 n.2, 919 A.2d 465 (2007).

The acquittee does not challenge the court's finding that he suffers from a mental illness. Instead, he challenges the court's finding that he continues to pose a danger to himself or others in the community. The acquittee focuses on the statements made by the court

during the rectification hearing, set forth above, in which it expressed its concern for the welfare of schoolchildren and women. The acquittee argues that, to the extent that the court granted the state's petition because it presumed that he posed a threat to schoolchildren, it improperly presumed dangerousness from the underlying offense, not on the basis of any evidence that he acted inappropriately toward one or more schoolchildren since the 2001 event that led to his arrest. According to the acquittee, "[t]he record shows that he has been clinically stable while consistently taking his prescribed medicine for approximately a decade. It is purely speculative to presume that, if for some reason, [he] discontinued his psychiatric medication regime and became psychotic, that he would experience the same florid psychosis and command hallucinations that compelled him to commit the index offense.[5] Similarly, the sequence of events required for the reoccurrence of such an incident is not only speculative, but also does not constitute the requisite risk of imminent danger to schoolchildren because it requires that, at some point, [he] discontinue his psychiatric medication, thereafter suffer a decompensation, ultimately become psychotic and then experience command hallucinations to harm a child in school." (Emphasis omitted; footnote added.) The acquittee argues that, to the extent that the court granted the state's petition based on a finding that he posed a danger to women, there was no evidence that, he "harmed, threatened, or posed a risk of imminent danger to a woman." The acquittee acknowledges, nonetheless, that he has exhibited "inappropriate" behavior toward women during the course of his commitment to the board.

As a preliminary matter, we disagree with the acquittee that the court improperly presumed dangerousness based on the offenses that led to his arrest. We are persuaded that, to the extent that the court referred in its decision to these offenses, it did so as part of a proper consideration of the factual issues before it. "In reaching its difficult decision [as to an acquittee's dangerousness], the court may and should consider the entire record available to it, including the [acquittee's] history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released." *State* v. *Putnoki*, 200 Conn. 208, 221, 510 A.2d 1329 (1986).

The acquittee also argues that it was improper for the court to focus on the safety of schoolchildren and women, for there was no evidence that he physically harmed either a schoolchild or a woman since the time of his commitment to the board. We note that the state did not bear the burden of proving that the acquittee had engaged in any type of physical violence during his commitment. It was sufficient for the state to prove

by clear and convincing evidence that the acquittee continues to pose a danger to himself or to others in the community. The court's reference to the well-being of schoolchildren is logically linked to the offenses for which he was prosecuted, but the court did not suggest, let alone explicitly state, that the acquittee had engaged in subsequent acts of violence toward a schoolchild. We further note that the record does not reflect that, during his lengthy confinement at Whiting Forensic Hospital and Connecticut Valley Hospital and, later, while he was subject to the restrictions on his liberty that were incident to his temporary leave or conditional release statuses while under the jurisdiction of the board, the acquittee has had an opportunity to encounter a schoolchild.

Moreover, the court's reference to the well-being of women logically is related to the records of the acquittee's confinement that were submitted in evidence.[6] Although those records do not describe acts of violence committed by the acquittee against women, they nonetheless reflect that the acquittee's treatment history during his commitment includes several instances in which he intimidated, inappropriately touched, and made socially inappropriate statements, often of a sexual nature, to female staff members.[7] Such inappropriate conduct is noted to be a continued concern up through the latest report that the board filed with the court dated August 27, 2019. Even though there was no evidence that the acquittee has ever harmed a woman physically, the fact that there are several instances of this type of conduct in his treatment records supports the court's concern for the safety and well-being of women. This concern naturally follows from the court's obligation under § 17a-593 (c) to consider whether the acquittee's discharge would pose a threat to others.

The acquittee argues that a finding that he posed an imminent threat of physical harm to himself or others in the community, particularly women, was clearly erroneous. This court has observed that, "[t]he determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the defendant must be balanced against the security interests of society. . . . [The court's] . . . inquiry should focus on whether the person is a danger to himself or others, whether he presents . . . the risk of imminent physical injury to others or self . . . . [T]he ultimate determination of mental illness and dangerousness is a legal decision . . . in which the court may and should consider the entire record available to it, including the defendant's history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released." (Citations omitted; footnote

omitted; internal quotation marks omitted.) *State* v. *Damone*, 148 Conn. App. 137, 170–71, 83 A.3d 1227, cert. denied, 311 Conn. 936, 88 A.3d 550 (2014); see also *State* v. *March*, 265 Conn. 697, 711–12, 830 A.2d 212 (2003).

The acquittee urges us to conclude that a finding that he posed a risk of imminent physical injury to himself or others was not supported by the evidence because such a risk would depend on him, outside of his current supervised environment, failing to take necessary psychiatric medications, decompensating, becoming psychotic and, ultimately experiencing command hallucinations that would lead to him posing such a risk. The acquittee relies on evidence that he has been clinically stable while under the board's supervision, while consistently taking his prescribed medicine for nearly one decade. We disagree with the acquittee that the court could not have found that, although under his current level of board supervision he does not pose an imminent risk of physical injury to himself or others, it is likely that he would pose an imminent risk of physical injury to himself or others if he were to be released from the board's supervision entirely. This is because the evidence before the court logically supported a finding that, if he were to be released from the board's supervision entirely, he would risk relapse once outside of his present controlled environment and present an imminent danger to himself or to others. See *State* v. *Damone*, supra, 148 Conn. App. 175; see also *State* v. *Warren*, supra, 100 Conn. App. 435 (fact that acquittee responded adequately to treatment while under board supervision did not undermine court's conclusion that continued commitment was justified); *State* v. *Coor*, 87 Conn. App. 717, 727, 733, 867 A.2d 124 (evidence supported finding of high likelihood that acquittee, who was in remission while under board's supervision, would become dangerous to himself or others if he stopped taking his medication), cert. denied, 273 Conn. 929, 873 A.2d 998 (2005); *State* v. *Jacob*, 69 Conn. App. 666, 685, 798 A.2d 974 (2002) (fact that acquittee had made progress was due, in part, to his confinement, supervision and ongoing treatment and did not undermine court's ultimate finding that he posed risk of danger to himself or others if released from board's supervision).

We note that there was evidence before the court that, following the acquittee's commitment to the board, he used physical violence toward other patients, he challenged another patient to engage in a physical altercation, and he engaged in otherwise threatening behavior toward others. In its 2019 report filed with the court, the board stated that the acquittee suffers from schizoaffective disorder, bipolar type; borderline intellectual functioning; cannabis use disorder; and tobacco use disorder. The board also stated: "[The acquittee] has a history of treatment noncompliance, including periodic

noncompliance with prescribed medication in a hospital setting. He also has a longstanding pattern of inappropriate and impulsive behaviors, which he usually exhibited when frustrated. For many years, [the acquittee's] cognitive limitations, psychiatric illness and chronic impulsive behaviors repeatedly delayed his transition to the community. However, he was eventually able to transition to overnights in the community in September, 2017, following a concerted effort by his treatment team to address his poor social skills and improve his frustration tolerance."

The board also stated that the acquittee had been granted conditional release since its last report to the court dated July 24, 2018, at which time he was discharged from the hospital and began living in the community, albeit with significant limitations that were linked to his ongoing treatment for mental illness. The board stated, however, that "[the acquittee's] experience living in the community remains limited and he is stable only because of substantial supervision and support, including daily monitored medication; a structured residential program with [forty] hours of mandated programming a week; limited travel in his own custody; in [six] hour increments; and weekly meetings with an individual therapist and [c]onditional [r]elease supervisor. Without these mandated safeguards, which his treaters continue to believe are required to address his risk, he is likely to become noncompliant with treatment and medication, increasing his risk to himself and the community. Given that he would no longer be subject to the safeguards if discharged from the board and that he was only released from hospital confinement during the past year and had not before that resided independently in the community since 2001, the board finds that he continues to require substantial supervision and that he cannot reside safely in the community without the board's continued oversight and support."

The court found that, during his commitment to the board, the acquittee had made progress and that the current level of his release into the community is "stable" only because of mandated safeguards imposed by the board. The court noted that the acquittee had expressed his intent, if discharged from the board's jurisdiction, to voluntarily comply with mandated safeguards. The acquittee, however, is unable to demonstrate that the court erred in determining, based on the board's report filed with the court, that he has not had a sufficient history of being in a conditional release status to support a conclusion that he can live in the community without board oversight. As we discussed previously in this opinion, it was reasonable for the court to base its determination not on whether the acquittee presented a risk of imminent harm to himself or others while under the board's supervision, but, whether, if he were to be released from the board's

supervision entirely, he posed a risk of imminent harm to himself or others. The board's findings squarely addressed this issue, and they support the court's decision.

Having reviewed the evidence presented to the court, we are persuaded that the court did not err in finding that the state met its burden, under § 17a-593, of establishing by clear and convincing evidence that the acquittee currently is mentally ill and poses a risk of imminent harm to himself or others. We conclude that the court's findings with respect to the danger that the acquittee continues to pose to the community and the need for significant and continued safeguards imposed by the board are not clearly erroneous.

## II

Next, the acquittee claims that the court improperly rejected his claim that § 17a-593, as applied to him, violates his right to equal protection guaranteed by the federal constitution. We are not persuaded.

The following additional facts are related to this claim. As we stated previously in this opinion, in connection with his motion to dismiss the state's petition to extend his commitment, the acquittee argued that his right to equal protection under the federal constitution was violated by the recommitment procedure to which he is subjected under § 17a-593, which implicates his right to individual liberty. He argued that the recommitment procedure that governs acquittees under § 17a-593 is applied more conservatively than the nominally identical commitment procedure that applies to civil committees under § 17a-515, that acquittees are similarly situated to civilly committed inmates for purposes of equal protection analysis, that an intermediate level of scrutiny should be utilized in an equal protection analysis of § 17a-593, and that § 17a-593 cannot withstand such scrutiny. The court, in an oral ruling, declined the acquittee's invitation to apply an intermediate standard of scrutiny and denied his motion to dismiss.

On appeal, the acquittee does not argue that § 17a-593 is facially discriminatory, but that it is discriminatory as applied to him. The acquittee argues that he is similarly situated to civilly committed inmates because his maximum term of commitment has expired, he has been discharged and afforded conditional release status, and he has largely demonstrated sustained progress in his mental health treatment. The state disagrees that the acquittee is similarly situated to civilly committed inmates. The state argues that there is a nexus between the acquittee's mental illness and the violent criminal conduct in which he engaged at a public school. In contrast, the state argues, civilly committed inmates have a prior felony or misdemeanor conviction, but there need not be a connection between the criminal

conduct underlying that conviction and the mental illness underlying their civil commitment. Although the acquittee focuses his argument on inmates who have been civilly committed, the state also notes that the civil commitment scheme applies to both inmates and civilians and, thus, civilly committed persons need not have committed any crime nor have been incarcerated.

We set forth our standard of review and relevant legal principles. A lower court's ruling on an equal protection claim presents this court with an issue of law to which we afford plenary review. See, e.g., *State* v. *Yury G.*, 207 Conn. App. 686, 695, 262 A.3d 981, cert. denied, 340 Conn. 909, 264 A.3d 95 (2021). "[T]he concept of equal protection [under the federal constitution] has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. . . . Conversely, the equal protection clause places no restrictions on the state's authority to treat dissimilar persons in a dissimilar manner. . . . Thus, [t]o implicate the equal protection [clause] . . . it is necessary that the state statute . . . in question, either on its face or in practice, treat persons standing in the same relation to it differently. . . . [Accordingly], the analytical predicate [of an equal protection claim] is a determination of who are the persons [purporting to be] similarly situated. . . . The similarly situated inquiry focuses on whether the [challenger is] similarly situated to another group for purposes of the challenged government action. . . . Thus, [t]his initial inquiry is not whether persons are similarly situated for all purposes, but whether they are similarly situated for purposes of the law challenged. . . . Entities are situated similarly in all relevant aspects if a prudent person, looking objectively at the incidents, would [deem] them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the relevant aspects are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples. . . .

"When a court analyzes a law under the equal protection clause, it must employ a particular standard of review. The most deferential standard is rational basis review, which applies in areas of social and economic policy that neither proceed along suspect lines nor infringe fundamental constitutional rights . . . . Rational basis review demands only that the challenged classification be rationally related to a legitimate government interest. . . . A party challenging a law under rational basis review bears the burden of proving that the law's class-based distinctions are wholly irrational. . . .

"The least deferential standard of review is strict

scrutiny, which applies both to laws that discriminate on the basis of a person's membership in a suspect class and to laws that burden a person's exercise of a fundamental right. . . . Under strict scrutiny, the state bears the burden of demonstrating that the challenged discriminatory means are necessary to the achievement of a compelling state interest. . . .

"Lying between the extremes of strict scrutiny and rational basis review is intermediate scrutiny, which typically applies to discriminatory classifications based on gender or illegitimacy. . . . Intermediate scrutiny also sometimes applies to laws that affect an important, though not constitutional, right. . . . Under intermediate scrutiny, the state bears the burden of establishing that the challenged discriminatory means are substantially related to an important governmental interest." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Dyous*, supra, 307 Conn. 315–18.

We begin by addressing whether the acquittee has established the necessary premise for his equal protection claim, that he is similarly situated to civilly committed inmates. Our decisional law has referred to the initial inquiry that the entities at issue be similarly situated as "[an] analytical predicate" to an equal protection claim; (internal quotation marks omitted) id., 315; as well as "[a] threshold issue" to be considered in evaluating such a claim. *Keane* v. *Fischetti*, 300 Conn. 395, 403, 13 A.3d 1089 (2011). This is because, if the entities at issue are not similarly situated in the first instance, the claim at issue does not truly implicate the equal protection clause, and it becomes unnecessary for the court to decide the constitutional issue of whether the challenged state action violates the equal protection clause. See *Stuart* v. *Commissioner of Correction*, 266 Conn. 596, 602, 834 A.2d 52 (2003).

As the parties observe, in prior opinions, both this court and our Supreme Court have addressed constitutional challenges to § 17a-593. Several of these cases are instructive. In *State* v. *Metz*, 230 Conn. 400, 402, 645 A.2d 965 (1994), our Supreme Court addressed a challenge, brought on due process and equal protection grounds, with respect to which party bears the burden of proof under § 17-593 (c). Our Supreme Court concluded that the statute must be construed such that the state bears the burden of proving "the need for a period of continued commitment of an acquittee after the expiration of the maximum term specified by [General Statutes] § 17a-582 (e) (1) (A)." Id., 408. In its analysis, our Supreme Court observed that "[f]ederal law has . . . recognized that insanity acquittees are a special class that should be treated differently from other candidates for commitment . . . . Thus, when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the

[c]onstitution permits the [g]overnment, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society. . . . For an insanity acquittee, the state may adopt procedures that presume the acquittee's continued dangerousness and that envisage a diminished risk that a person will be committed who is not mentally ill." (Citations omitted; internal quotation marks omitted.) Id., 414.

Our Supreme Court in *Metz* also observed that disparities in laws that distinguish between civilly committed persons and acquittees are constitutionally justified "because of the unique status of persons acquitted by reason of insanity. . . . We have acknowledged that the obvious difference between insanity acquittees and other persons facing commitment is the fact that the former have been found, beyond a reasonable doubt, to have committed a criminal act. . . . While the acquittee therefore may be deprived erroneously of his liberty in the commitment process, the liberty he loses is likely to be liberty which society mistakenly had permitted him to retain in the criminal process. . . .

"In contrast to an acquittee's differentiated status at an initial commitment hearing, our state law has, for certain purposes, likened acquittees to prisoners who have been transferred to a mental hospital during the pendency of their jail sentence. We have noted that both classes of hospital inmates are being deprived of their liberty primarily for the protection of society; both have the same financial resources; and both have the same need for treatment. . . . Thus, this court has held that equal protection of the laws mandates that an acquittee, like a prisoner under our statutes, should not bear the costs of his commitment." (Citations omitted; internal quotation marks omitted.) Id., 417.

In *Metz*, the court also stated that, "[a]fter the expiration of a maximum term of confinement, it is difficult to find a constitutional justification for a categorical distinction between an insanity acquittee and an incarcerated prisoner who was transferred to a mental hospital while he was serving his criminal sentence. In each instance, the purpose of commitment is to treat the individual's mental illness and protect him and society from his potential dangerousness . . . . In each instance, furthermore, the qualitative character of the liberty deprivation is the same, irrespective of the fact that the Superior Court rather that the Probate Court retains jurisdiction over the propriety of an acquittee's continued commitment." (Citations omitted; internal quotation marks omitted.) Id., 424–25.

In *State* v. *Long*, supra, 268 Conn. 510, the state appealed from a judgment of dismissal rendered by the trial court after it granted an acquittee's motion to dismiss a petition for an order of continued commitment of the acquittee pursuant to § 17a-593 (c). In *Long*,

the trial court concluded that § 17a-593 (c) violated the acquittee's right to equal protection under the federal constitution in that "it treats acquittees . . . differently from convicted prisoners who subsequently are civilly committed to a mental hospital at some point after they have been incarcerated . . . ." Id., 514. Beyond challenging the acquittee's standing to raise an equal protection challenge, the state argued on appeal that the statute did not violate his equal protection rights because it discriminated against persons with psychiatric or intellectual disabilities on the basis of their proven criminal acts, not their mental disability, and, thus, it survives rational basis scrutiny. Id., 528. In analyzing the equal protection claim, our Supreme Court noted that it "assume[d] arguendo, without deciding, that acquittees are similarly situated to civilly committed inmates." Id., 535. The court thereafter concluded that § 17a-593 (c) survived rational basis review, reversed the judgment of the trial court, and remanded the case to the trial court for further proceedings. Id., 537, 541.

In *State* v. *Lindo*, 110 Conn. App. 418, 419, 955 A.2d 576, cert. denied, 289 Conn. 948, 960 A.2d 1038 (2008), an acquittee appealed from a trial court's judgment granting the state's petition for an order of continued commitment. The acquittee claimed that § 17a-593 (c), as applied to him, violated his right to equal protection under the federal constitution because, "at the time of the recommitment hearing . . . he was an inmate and therefore should have been afforded the more stringent procedural protections applicable when the state seeks to commit mentally ill prisoners pursuant to [the civil commitment procedure made applicable to inmates] pursuant to . . . § 17a-515." Id., 422. In analyzing and ultimately rejecting the merits of the acquittee's equal protection claim, this court, following *Long*, assumed, without deciding, that acquittees are similarly situated to mentally ill inmates. Id., 426.

Finally, in *State* v. *Dyous*, supra, 307 Conn. 302, an acquittee appealed from a trial court's judgment granting the state's petition for an order of continued commitment pursuant to § 17a-593 (c). The acquittee claimed that § 17a-593, both on its face and as applied to him, violated his right to equal protection under the federal constitution; id., 315; because it subjects "insanity acquittees to a recommitment procedure that imposes greater burdens on individual liberty than does the procedure for obtaining an order of civil commitment set forth in § 17a-498, which applies to similarly situated civilly committed inmates, [and that the disparate treatment of these two classes of inmates] does not substantially relate to the achievement of an important governmental interest." Id., 303.

Our Supreme Court in *Dyous* first addressed the acquittee's burden of demonstrating that he and other insanity acquittees who face the prospect of continued

commitment are similarly situated to civilly committed inmates. The court reasoned: "Both groups have been proven beyond a reasonable doubt to have engaged in criminal conduct, both are currently mentally ill, both require treatment, and both present a potential danger to society, yet civilly committed inmates are subject to the statutory scheme governing civil commitment set forth in § 17a-498 et seq., whereas insanity acquittees who have reached the end of their terms of commitment are subject to the wholly separate statutory scheme including § 17a-593 (c) and related provisions. Although we acknowledge that there is some persuasive force to the state's contention that the two groups actually are not similarly situated—only insanity acquittees necessarily were mentally ill at the time of their prior criminal conduct, for example, and only insanity acquittees were proven to have engaged in such conduct because they were mentally ill—we assume, *arguendo*, that the two groups are similarly situated and that § 17a-593 accordingly may be analyzed under the equal protection clause." (Emphasis altered.) Id., 316. Although it chose not to resolve the issue of whether insanity acquittees and civilly committed inmates are similarly situated for equal protection purposes, the court nonetheless observed that "the issue is . . . [not] clear cut in light of the important features that the two groups have in common."[8] Id., 316 n.11.

The court also stated that, "to the extent that . . . *Metz* stands for the . . . proposition that, after the expiration of a maximum term of commitment, the equal protection clause requires the state to treat an insanity acquittee exactly as it would treat a civilly committed inmate, we reject that proposition as unfounded. However preferable it may be as a matter of policy for the state to treat insanity acquittees, following the expiration of their maximum term of commitment, in exactly the same manner as it treats civilly committed inmates . . . the equal protection clause simply does not require that the state treat these two groups identically. The special public safety concern that is raised by the prospective release of a person like [the acquittee in *Dyous*] does not evaporate the moment such a person reaches the end of his maximum term of commitment. An acquittee's maximum term of commitment bears no necessary relation to public safety: the maximum allowable term of commitment is equal to the maximum sentence that could have been imposed if the acquittee had been convicted of the offense . . . and [t]here simply is no necessary correlation between severity of the offense and the length of time necessary for recovery." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 331–32 n.18. The court in *Dyous* went on to conclude, however, that § 17a-593 was constitutional as applied to the acquittee and, consequently, that the statute was constitutional on its face. Id., 334.

Neither party suggests that we are bound by precedent to presume, as courts in prior cases have, that the acquittee is similarly situated to civilly committed inmates. Rather, we conclude that he is not. "The [e]qual [p]rotection [c]lause of the [f]ourteenth [a]mendment to the United States [c]onstitution is essentially a direction that all persons similarly situated should be treated alike." (Internal quotation marks omitted.) *Thomas* v. *West Haven*, 249 Conn. 385, 392, 734 A.2d 535 (1999), cert. denied, 528 U.S. 1187, 120 S. Ct. 1239, 146 L. Ed. 2d 99 (2000). As we have discussed previously in this opinion, in discussing what constitutes similarly situated entities, our Supreme Court has stated that entities need not be identical to be similarly situated, but they must be roughly equivalent. *State* v. *Dyous*, supra, 307 Conn. 316, citing *Kelo* v. *New London*, 268 Conn. 1, 104 n.98, 843 A.2d 500 (2004), aff'd, 545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005).

Before this court, the acquittee argues that, in *Dyous*, our Supreme Court "rejected" the argument that acquittees that share his characteristics are not similarly situated to civilly committed inmates. As our previous discussion of *Dyous* unambiguously reflects, however, the court did not reach such a conclusion; it chose to presume, without deciding, that the groups in *Dyous* were similarly situated. See *State* v. *Dyous*, supra, 307 Conn. 316. In an attempt to demonstrate that he is similarly situated to civilly committed inmates, the acquittee observes, accurately, that the state seeks his commitment beyond his maximum allowable term of commitment, he has "largely demonstrated sustained progress" in his treatment and, in fact, has been afforded conditional release status. He also relies on language from *Dyous* stating that acquittees as a class, like civilly committed inmates, have been proven beyond a reasonable doubt to have engaged in criminal conduct, are mentally ill, require treatment, and pose a potential danger to society. See *State* v. *Dyous*, supra, 316.

We are persuaded by the state's arguments that the acquittee is not similarly situated to civilly committed inmates. As the state correctly observes, for the acquittee to have prevailed at his criminal trial on his insanity defense, he had to prove that there was a nexus between his mental illness and his violent criminal conduct. This nexus existed either in terms of his being unable to appreciate the wrongfulness of his conduct or in terms of his being unable to control his conduct. Section 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." In the civil

commitment process, such a proven correlation between mental illness and criminal conduct simply need not exist.

The acquittee does not satisfactorily address the difference in the circumstances that, on the one hand, gave rise to his commitment as a person who committed a violent offense due to mental illness and, on the other hand, gave rise to the commitment of an inmate who is civilly committed pursuant to § 17a-515 for a psychiatric disability. More importantly, we are not persuaded that, in light of the continued danger that he poses to others due to his mental illness; see part I of this opinion; his progress in treatment or the fact that he has reached the end of his maximum term of confinement should lead us to now conclude that he is similarly situated to inmates whose mental illness has not manifested in criminal conduct. At the time of his criminal trial, it was proven that the acquittee's mental disease or defect caused him to engage in acts that constituted criminal offenses. In contrast, a civilly committed inmate has been proven to suffer from a psychiatric disability, regardless of whether his or her mental illness has manifested cognitive and/or volitional effects that resulted in the commission of criminal conduct.

Simply put, the acquittee's focus on the fact that he has reached his maximum term of commitment and the sustained progress in his treatment leading to his conditional release status does not alter the significance of the circumstances that led to his commitment, let alone undermine the fact that his mental illness continues to pose a danger to society. We recognize, as our Supreme Court has observed, that the issue of whether acquittees, as a general class, and civilly committed inmates are similarly situated for equal protection purposes is not necessarily clear-cut. Yet, despite the fact that the acquittee and civilly committed inmates undoubtedly share other characteristics, the significant difference in the circumstances giving rise to the acquittee's commitment leads us to conclude that he is dissimilar to civilly committed inmates for equal protection purposes. Accordingly, we reject the acquittee's equal protection claim.

The judgment is affirmed.

In this opinion CRADLE, J., concurred.

[1] Later, the board determined that, during the incident at issue, the acquittee was responding to "command auditory hallucinations that told him to assault a minor."

[2] Pursuant to § 17a-515, General Statutes § 17a-498, which codifies the involuntary civil commitment procedure, is made applicable to any person in the custody of the Commissioner of Correction. Our Supreme Court has explained that "[t]he procedure for extending an insanity acquittee's term of commitment to the [board] imposes greater burdens on individual liberty than does the civil commitment procedure applicable to civilly committed inmates, that is, mentally ill, convicted defendants who were transferred, pursuant to §§ 17a-498 and 17a-515, to a psychiatric facility while they were serving their sentences, and whom the state seeks to commit to a similar institution after their sentences end. Among other disparities between the two commitment schemes, the procedure for recommitting insanity

acquittees directs the finder of fact to '[consider] that its primary concern is the protection of society'; General Statutes [Rev. to 2011] § 17a-593 (g); whereas the procedure for recommitting civilly committed inmates directs the finder of fact to '[consider] whether . . . a less restrictive placement is available . . . .' General Statutes § 17a-498 (c)." (Footnotes omitted.) *State* v. *Dyous*, 307 Conn. 299, 301, 53 A.3d 153 (2012).

[3] The state represents, and the acquittee does not dispute, that, on October 18, 2021, the court, with the agreement of the parties, extended the acquittee's commitment until March 21, 2023.

[4] General Statutes § 17a-593 provides in relevant part: "(c) If reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities or a person with intellectual disability to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others, the state's attorney, at least one hundred thirty-five days prior to such expiration, may petition the court for an order of continued commitment of the acquittee.

"(d) The court shall forward any application for discharge received from the acquittee and any petition for continued commitment of the acquittee to the board. The board shall, within ninety days of its receipt of the application or petition, file a report with the court, and send a copy thereof to the state's attorney and counsel for the acquittee, setting forth its findings and conclusions as to whether the acquittee is a person who should be discharged. The board may hold a hearing or take other action appropriate to assist it in preparing its report.

"(e) Within ten days of receipt of a recommendation for discharge filed by the board under subsection (a) of this section or receipt of the board's report filed under subsection (d) of this section, either the state's attorney or counsel for the acquittee may file notice of intent to perform a separate examination of the acquittee. An examination conducted on behalf of the acquittee may be performed by a psychiatrist or psychologist of the acquittee's own choice and shall be performed at the expense of the acquittee unless he is indigent. If the acquittee is indigent, the court shall provide him with the services of a psychiatrist or psychologist to perform the examination at the expense of the state. Any such separate examination report shall be filed with the court within thirty days of the notice of intent to perform the examination. To facilitate examinations of the acquittee, the court may order him placed in the temporary custody of any hospital for psychiatric disabilities or other suitable facility or placed with the Commissioner of Developmental Services.

"(f) After receipt of the board's report and any separate examination reports, the court shall promptly commence a hearing on the recommendation or application for discharge or petition for continued commitment. At the hearing, the acquittee shall have the burden of proving by a preponderance of the evidence that the acquittee is a person who should be discharged.

"(g) The court shall make a finding as to the mental condition of the acquittee and, considering that its primary concern is the protection of society and its secondary concern is the safety and well-being of the acquittee, make one of the following orders: (1) If the court finds that the acquittee is not a person who should be discharged, the court shall order the recommendation or application for discharge be dismissed; or (2) if the court finds that the acquittee is a person who should be discharged, the court shall order the acquittee discharged from custody. The court shall send a copy of such finding and order to the board."

The legislature amended subsection (g) of § 17a-593 since the events underlying the present appeal to add the phrase "and its secondary concern is the safety and well-being of the acquittee." See Public Acts 2022, No. 22-45, § 5. All references herein to § 17a-593 are to the current revision of the statute unless otherwise indicated.

[5] The psychiatric profession refers to the offenses that led to an acquittee's arrest as "index offenses." See, e.g., *State* v. *Torell*, Superior Court, judicial district of New Haven, Docket No. 03-0217045 (February 21, 2018).

[6] The court had before it reports prepared by the board dated January 16, 2013, July 2, 2014, January 29, 2016, July 24, 2018, and August 27, 2019. The court also had before it progress and risk assessment reports prepared for the board by a licensed clinical social worker dated January 24, 2019, and July 3, 2019, as well as conditional release progress reports prepared for the board by the acquittee's clinical release supervisor dated May 2, 2019, August 1, 2019, and November 1, 2019. Also in evidence were transcripts of proceedings before the board on December 7, 2012, May 16, 2014, January 8, 2016, June 2, 2017, September 15, 2017, and June 29, 2018.

[7] For example, there was evidence before the court that, on July 18, 2016, the acquittee approached a female staff member in a restricted storage room secured by a door that automatically closed. The staff member instructed the acquittee to back out of the room. Although the acquittee complied, he nonetheless remained close to the door, causing the staff member to feel threatened or barricaded in the room. Later, the acquittee remarked to the female staff member that he was "out to get" her.

There was evidence that, in 2012, the acquittee was "occasionally inappropriate with female staff [members]." Specifically, he had referred to some of the female staff as "baby" and had requested hugs from female staff members.

The board's report filed with the court dated January 16, 2013, reflects that, in August, 2009, "[the acquittee] displayed socially inappropriate behavior, touching staff and making inappropriate comments to female staff." The report also noted that, in August, 2011, the acquittee "episodically lost his privileges due to inappropriate, often impulsive and self-defeating behaviors, including not respecting other people's boundaries, making inappropriate statements towards staff, and engaging in disrespectful and occasionally threatening behaviors toward others." The board found that the acquittee "continues to exhibit inappropriate social behavior, preventing his transition to the community. Though he is clinically stable with only intermittent episodes of threatening behavior in his highly structured setting, he has yet to demonstrate clinical stability and behavioral control outside that setting."

The board's report filed with the court dated July 2, 2014, reflected that, in December, 2013, the acquittee's temporary leave privileges were suspended after he had exhibited "inappropriate and impulsive behavior" while in the community and he insisted on returning to hospital care.

In the latest report filed with the court, dated August 27, 2019, the board noted that the acquittee "has a longstanding pattern of inappropriate and impulsive behaviors, which he usually exhibited when frustrated." In particular, it is noted that the acquittee has a history of "inappropriate" behavior with women.

[8] The court's observation was made in response to a concurring opinion in which a concurring justice stated: "Although this court often assumes that two groups are similarly situated for the purpose of conducting a more comprehensive equal protection analysis . . . I believe that insanity acquittees and those who are civilly committed are distinguishable on such a fundamental level that there is no reason to apply the presumption in the present case. As this court explained in *Long*, '[w]hat differentiates these two groups for the purposes of recommitment procedures is the acquittee's proven criminal offense, which has been adjudicated to be the product of mental illness. A verdict of not guilty by reason of mental disease or defect establishes two facts: (1) the person committed an act that constitutes a criminal offense; and (2) he committed the act because of mental illness. . . . Thus, unlike a civilly committed inmate, an acquittee has proven to the fact finder that his mental disease or defect caused him to commit a crime, thereby establishing a legal nexus between the acquittee's mental illness and the criminal act.' . . . *State* v. *Long*, supra, 268 Conn. 539–40." (Citations omitted.) *State* v. *Dyous*, supra, 307 Conn. 337–38 (*Zarella, J.*, concurring). In his concurrence, the justice further stated: "The discharge of an insanity acquittee, whose status indicates that he or she has been declared dangerous to society due to the commission of a criminal act, raises the specter that the danger to society will recur if the mental disease recurs, which is not the case with a civilly committed inmate whose mental disease or defect was not accompanied by a criminal act. Accordingly, although insanity acquittees and civilly committed inmates share certain other characteristics, I would conclude that they cannot be considered similarly situated for the purpose of an equal protection challenge to § 17a-593." (Footnote omitted.) Id., 339 (*Zarella, J.*, concurring).